

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

05-20121

CIV-JORDAN

MAGISTRATE JUDGE
BROWN

IN RE:  Request from Antigua and Barbuda
Pursuant to the Treaty Between the
Government of the United States of
America and the Government of
Antigua and Barbuda on Mutual Legal
Assistance in Criminal Matters in
the Matter of Lester Bird, et al

_____/

FILED UNDER SEAL

FILED by _____ D.C.

JAN 1 4 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an order appointing a commissioner to collect evidence

requested by Antigua and Barbuda in its attached treaty request made pursuant to the <u>Treaty Between

the Government of the United States of America and the Government of Antigua and Barbuda on

Mutual Legal Assistance in Criminal Matters</u>, entered into force July 1, 1999 [hereinafter referred

to as "the Treaty"].

A treaty constitutes the law of the land.  U.S. Const. art. VI.  The provisions of a treaty have

equal footing with acts of Congress and are binding on the courts.  <u>Asakura v. City of Seattle,

Washington</u>, 265 U.S. 332, 341 (1924); <u>United States v. The Peggy</u>, 5 U.S. 103 (1801).  To the

extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty

supersedes the statute.  <u>Zschernig, et al. v. Miller, Administrator, et al.</u>, 389 U.S. 429, 440-441

(1968); <u>United States v. Erato</u>, 2 F.3d 11, 15-16 (2d Cir. 1993); see <u>Breard v. Greene</u>, 523 U.S. 371,

174 (1998).

A.    <u>The Treaty</u>

The United States and Antigua and Barbuda entered into the Treaty for the purpose of improving the effectiveness of the law enforcement authorities of both states in the investigation and prosecution of crime. Preamble to the Treaty. The Treaty obliges each state to provide assistance to the other in investigations and prosecutions of offenses, and in proceedings related to criminal matters. Article 1. Assistance includes taking testimony or statements of persons, providing documents and other evidence, and immobilizing criminally obtained assets. Article 1(2); <u>Barr v. U. S. Department of Justice</u>, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), <u>aff'd</u>, 819 F.2d 25 (2d Cir. 1987).

The Treaty empowers federal district courts to execute treaty requests in order to comply with the United States' treaty obligation. Article 5(1) provides that:

> The competent judicial or other authorities of the Requested State shall have power to issue subpoenas, search warrants, or other orders necessary to execute the request.

The Treaty contemplates that federal district courts will use compulsory measures to execute such requests. Article 8(1) provides that:

> A person in the Requested State from whom testimony or evidence is requested shall be compelled, if necessary, to appear and testify or produce items, including documents, records, and articles of evidence.

The Treaty eliminates dual criminality as a precondition for assistance except where the treaty specifically provides for it (i.e., with respect to searches and seizures and forfeiture). Consequently, where an exception does not apply, each state is obligated to provide assistance without regard to whether the conduct under investigation or prosecution would constitute an offence under the laws of the Requested State. Article 1(3).

2

B.    Use of the Treaty to Execute Requests for Assistance

The Treaty is self-executing and requires no implementing legislation.  See Letter of Submittal of Treaty to the President from the Department of State, June 18, 1997.  Even so, it contains little in the way of a procedural framework for executing requests.  Consequently, federal district courts routinely utilize the "commission" procedure authorized by 28 U.S.C. § 1782, the statute governing the provision of assistance for foreign judicial proceedings generally, to fulfill their judicial responsibility under the Treaty of executing such requests.

1. Appointment of a commissioner

Section 1782 provides in pertinent part:

> The district court . . . may direct that the testimony or statement [of a person who resides or is found within the district] be given or the document or other thing be produced, before a person appointed by the court.

A federal district court customarily appoints or "commissions" a person ("commissioner") to collect evidence on behalf of the court and authorizes the commissioner to submit the evidence collected to the requesting foreign court or authority.  With requests from foreign authorities for assistance in criminal matters, a court typically appoints an Assistant U.S. Attorney as commissioner. [However, a court also may commission a foreign authority together with (or in lieu of) an Assistant U.S. Attorney.  See, e.g., In re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991).

The application to a federal district court for appointment of a commissioner to execute a foreign request for judicial assistance is generally made ex parte.  In re Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 688 (D.C. Cir. 1989); In re Letters Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).

2. Establishment of an evidence-collecting procedure

Section 1782 further provides in pertinent part that:

> To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A federal district court empowers a commissioner to collect the evidence using the procedure prescribed by the court. A court has "complete discretion in prescribing the procedure to be followed." Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), reprinted in 1964 U.S. Code Cong. & Admin. News 3782, 3789. When a court's order fails to specify a procedure by which a commissioner is to collect the evidence, the Federal Rules of Civil Procedure apply. In re Letters Rogatory from the Tokyo District Prosecutor's Office, Tokyo, Japan, 16 F.3d 1016, 1019 (9th Cir. 1994); In re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 31 (S.D.N.Y. 1991). However, as Section 1782 makes clear, when a court does specify a procedure other than one in accordance with the Federal Rules of Civil Procedure, the alternative procedure shall apply. 28 U.S.C. § 1782(a); Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1098 (2d Cir. 1995) [hereinafter Euromepa].

a.    Commissioner's subpoena

Article 5(1) provides for the issuance of procedural documents, such as subpoenas, to effectuate the gathering of evidence:

> The competent judicial or other authorities of the Requested State shall have power to issue subpoenas, search warrants, or other orders necessary to execute the request.

If a federal district court so orders, a commissioner may use the attached form, entitled "commissioner's subpoena," to obtain the requested evidence. See, e.g., Erato, 2 F.3d at 13-14 (incorporating in pertinent part the district court's order directing the use of commissioner's

4

subpoenas).  The commissioner's subpoena is a creation of neither the Federal Rules of Criminal

Procedure nor the Federal Rules of Civil Procedure, but is an order of the court for the production

of evidence in accordance with both the Treaty and Section 1782.  See Article 5(1); 28 U.S.C. 1651;

White v. National Football League, et. al, 41 F.3d 402, 409 (8th Cir. 1994), cert. denied, 515 U.S.

1137 (1995) (a court may issue whatever process it deems necessary to facilitate disposition of the

matter before it).  Upon authorization by a court, a commissioner may issue such commissioner's

subpoenas as are necessary to execute the request.

           b.    Notice of evidence taking

      Article 8(1) authorizes use of compulsory process in the execution of treaty requests

comparable or similar to that used in domestic criminal investigations or prosecutions:

> A person in the Requested State from whom testimony or evidence is
> requested shall be compelled, if necessary, to appear and testify or produce items,
> including documents, records, and articles of evidence.

Inasmuch as grand jury and criminal trial subpoenas are issued without notice to other than the

recipients (i.e., no notice to targets, defendants, or third parties), commissioner subpoenas issued in

execution of treaty requests likewise should require no notice to other than the recipients.

Accordingly, a federal district court should authorize a commissioner to collect the evidence

requested without notice to any party other than the recipient of the commissioner's subpoena except

to the extent that a request asks for specific notice procedures.[1]

---

[1]    Generally, U.S. authorities execute requests for judicial assistance in criminal matters
without notification to actual or potential targets of investigations, or even to parties in proceedings.
U.S. authorities rely on the requesting courts and authorities to provide such notice directly to the
relevant parties as foreign law requires or to request that U.S. executing authorities follow stated
notice procedures when necessary or useful under foreign law or practice.  Foreign requests have
asked (1) that a person to be interviewed (generally a defendant or suspect) be given notice of
applicable testimonial privileges (e.g., against self-incrimination) at the time of the interview and
(2) that a defendant and defense counsel be permitted to be present during the taking of testimony
of a witness and be given sufficient notice to make arrangements.

C.      The Present Request

The Central Authority for Antigua and Barbuda, pursuant to Article 2 of the Treaty, has made the instant treaty request in connection with a criminal investigation of Lester Bird, Asot Michael, John E. St. Luce, Robin Yearwood, and Bruce Rappaport on charges of conspiring to defraud the Government of Antigua and misbehavior in public office.

The investigation revealed that the Honorable Lester Bryant Bird, former Prime Minister and Minister of Foreign Affairs; Mr. Asot A. Michael, former Advisor in the Office of the Prime Minister; the Honorable John E. St. Luce, former Minister of Finance; the Honorable Robin Yearwood, former Minister of Public Utilities and Aviation; and the Honorable Bruce Rappaport, former Ambassador of the Government of Antigua and Barbuda, allegedly conspired to defraud the Government of Antigua and Barbuda.  Specifically, the Attorney General of Antigua and Barbuda alleges that former top members of the Antiguan government improperly diverted monies, estimated to be approximately $28 million, from a debt settlement into bank accounts controlled by Mr. Rappaport, with the knowledge of Mr. Bird and others.  The Attorney General believes that since October 2003, these monies were diverted into a bank account in Miami, Florida.

In furtherance of its investigation, the Government of Antigua and Barbuda requests assistance in obtaining bank account records from a bank in Miami, Florida.

Accordingly, to execute this request, the government moves this court to issue the attached

order appointing Hugo L. Black III as commissioner, authorizing him to take the actions necessary,

including the issuance of commissioner's subpoenas, to obtain the evidence requested, and to adopt

such procedures in receipt of the evidence as are consistent with the intended use thereof.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____

HUGO L. BLACK III
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0053074
99 NE 4th Street, Fourth Floor
Miami, FL 33132-2111
Tel     (305) 961-9028
FAX   (305) 530-6168
E-Mail: hugo.black@usdoj.gov

COMMISSIONER'S SUBPOENA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TO:      _____
         _____
         _____

I, Commissioner Hugo L. Black III, an Assistant United States Attorney for the Southern

District of Florida, acting under the authority of the <u>Treaty Between the Government of the United</u>

<u>States of America and the Government of Antigua and Barbuda on Mutual Legal Assistance in</u>

<u>Criminal Matters</u>, and under Title 28, United States Code, Section 1782, for the purpose of rendering

assistance to Antigua and Barbuda, command that you appear before me in Room 400, at the James

Lawrence King Federal building located at 99 NE 4th Street, Miami, Florida 33132, on _____,

2005, at \_\_\_\_ a.m./p.m., to provide testimony/documents regarding an alleged violation of the laws

of the Government of Antigua and Barbuda, namely, misbehavior and misconduct in office and

conspiracy to defraud the Government of Antigua and Barbuda, and that at the time and place

aforesaid you provide the following:


For failure to attend and provide testimony/said documents, you may be deemed guilty of

contempt and liable to penalties under the law.

Dated:


COMMISSIONER HUGO L. BLACK III
Assistant United States Attorney for the
Southern District of Florida
Telephone 305-961-9028



**GOVERNMENT OF ANTIGUA AND BARBUDA**

Ministry of Justice and Legal Affairs
Office of the Attorney General
Government Office Complex
Parliament Drive
St. John's, ANTIGUA W.I.

Telephone: (268) 462-0017
Fax: (268) 462-2465
Email: legalaffairs@antigua.gov.ag



TO:        THE CENTRAL AUTHORITY OF THE UNITED STATES OF
           AMERICA

FROM:      THE CENTRAL AUTHORITY OF THE STATE OF ANTIGUA
           AND BARBUDA

SUBJECT:   LETTER OF REQUEST FOR ASSISTANCE IN OBTAINING
           BANK RECORDS

RE:        LESTER BIRD, ASOT MICHAEL, JOHN ST. LUCE, ROBIN
           YEARWOOD and BRUCE RAPPAPORT

### PLEASE KEEP CONFIDENTIAL

The Central Authority of the State of Antigua and Barbuda requests the assistance of the Central Authority of the Commonwealth of Bermuda in connection with an ongoing criminal investigation to gather evidence in a contemplated criminal proceedings. Assistance is requested pursuant to the Treaty on Mutual Legal Assistance in Criminal Matters signed on 31st October, 1996.

The following case involves the Office of the Prime Minister, the Ministry of Finance, the Ministry of Public Utilities and Aviation and within that Ministry a State Agency known as the Antigua Public Utility Authority and Bruce Rappaport as both an Ambassador of the Government and attached to a third party known as IHI Debt Settlement Company. The offences are alleged to have been committed by one or more of the following who were "public officials" at the time:

Hon. Lester Bryant Bird, Prime Minister and Minister of Foreign Affairs
Mr. Asot A. Michael, Advisor in the Office of the Prime Minister
Hon. John E. St. Luce, Minister of Finance

1

182-20874

Hon. Robin Yearwood, Minister of Public Utilities and Aviation
His Excellency, the Hon. Bruce Rappaport, Ambassador of the Government of
Antigua and Barbuda and in his private capacity, attached to IHI Debt Settlement
Company, a company incorporated in Hong Kong and banking in Bermuda and
later Florida.

## BACKGROUND

Government of Antigua and Barbuda (GOAB) and Ishikawajima-Harima Heavy
Industries Co., Ltd. (IHI) entered into a contract on March 1, 1985 related to the
construction of the Crabbs Desalination and Power Plant (Crabbs) at a price of US$33
million with 85% or US$29,750,000 to be financed by IHI and repaid over a period of ten
years.

On April 7, 1986, V. C. Bird as Prime Minister signed a GOAB Letter of Guarantee to
IHI to secure their loan to the Antigua Public Utilities Authority as owner of Crabbs to
finance the building of the Crabbs Desalination and Power Plant in Antigua.  The original
IHI loan principal was US$29,750,000 with interest at 8% for 10 years that was pre-
calculated to be US$12,495,000 for a total repayment amount of US$42,245,000 at
maturity, to be paid by 20 semi-annual payments in the months of May and November for
the 10 years ending November 1997.

Within the GOAB, the Crabbs is owned by the state agency known as the Antigua Public
Utility Authority (APUA) and as a result the IHI debt was recorded as an obligation of
the APUA and was subject to annual audit by the audit firm of Pannell Kerr located in
Antigua.

On July 17, 1997 K. Iijima of IHI wrote to Lester Bird, as Prime Minister to advise that
total debt of US$40,236,875 was due for the period May 1988 to May 1997 and to
request that GOAB confirm this debt amount if settlement is not possible.  Over the ten
years, minimal repayment had been made by GOAB.

On September 11, 1997 an Agreement was made between GOAB and IHI Debt
Settlement Company, signed by Lester Bird, Prime Minister and John St. Luce Minister
of Finance for GOAB and Bruce Rappaport for IHI Debt Settlement Company whereby
IHI Debt Settlement Company assumed the IHI debt in the amount of US$133,169,013
(calculated to be paid over 25 years) on behalf of the GOAB.

On September 18, 1997, Keith Hurst, as the Financial Secretary issued a memo to
Minister St. Luce to advise that after his review of the Agreement proposed by Bruce
Rappaport the total debt to IHI was US$91,276,515.57 (to be paid over 25 years) and
"Under the circumstances therefore we cannot recommend signing of the Agreement as
the difference is too great".  Mr. Hurst has advised that there was no response to him
from Minister St. Luce.

2

This investigation is focused on the "difference" and a determination of the ultimate beneficiary of the funds paid to Bruce Rappaport via IHI Debt Settlement Company.

## SUMMARY OF INVESTIGATION TO DATE

Keith Hurst was the Financial Secretary in the Ministry of Finance from 1984 to 1999 and an advisor to the Minister thereafter. The position of Financial Secretary is the highest civil service position in the Ministry. During the relevant times, John St. Luce was the Minister of Finance to whom Hurst reported. We have interviewed Hurst and his input is recorded herein.

Mr. Hurst stated that the GOAB could hardly cover its domestic debt and had no ability to repay any of the foreign debt, "we did not have the money". Most of these loans were export credits. "I was against the idea of renegotiation as no matter how low the monthly payment was, we still could not pay. The only source of money for external debt was the consumption tax and that was under the control of Rappaport through West Indies Oil Company (WIOC). Rappaport felt secure in negotiating for GOAB because he had no risk, he held the purse as WIOC would collect the consumption tax from the dealers and pay themselves. Everyone else would be running a risk in doing business with us".

(Bruce Rappaport in the early 1980's acquired the WIOC from the GOAB to become the exclusive importer of fuel products to Antigua, a position he continues to hold today. More specifically, the purchase agreement was made between the GOAB (Lester Bird, Deputy Premier and Minister of Economic Development and Tourism) and the National Petroleum Limited incorporated in Bermuda (Bruce Rappaport). Hence the consumption tax is paid by the consumers who purchase his products and it becomes the source of revenue to GOAB that is paid by GOAB to Rappaport to fund the loan repayments that Rappaport negotiates on behalf of GOAB. That explains the Hurst comment "he had no risk")

On April 10, 1990 S. Sakamoto from Ishikawajima-Harima Heavy Industries Co., Ltd. (IHI) wrote to Keith Hurst, as Financial Secretary in the Ministry of Finance regarding their loan for the Crabbs Power and Desalination Plant to advise that principal and interest of US$10,784,375 had been due on April 6, 1990. Sakamoto noted that to date the GOAB had repaid only US$2,008,125 and that the outstanding amount excluded the interest due on the delayed principal and interest payments.

However, prior to the IHI letter, the GOAB was already in arrears and in negotiations through Bruce Rappaport with two other creditors. On March 16, 1990 the GOAB had granted to Bruce Rappaport a Power of Attorney, (Hurst says it was prepared by Rappaport's lawyers) to negotiate settlement of the following debts that included IHI:

- Credit Suisse, Zurich, a US$16 million loan for the expansion of the Halcyon Cove Hotel
- Foster Wheeler, U.K., a US$22 million loan for the desalination plant
- IHI, Japan, a US$49 million loan for the desalination plant

3

Rappaport's remuneration was set out in paragraph 8 of the Power of Attorney. It states the Attorney shall be entitled to receive from the GOAB a commission equal to 6% of the outstanding Credit Suisse debt and any savings on the Foster Wheeler or IHI debt for terms more favourable than the "Minimum Terms" specified on Schedule 1 to the agreement as follows:

- Credit Suisse: 50% of the currently outstanding...debt will be repayable by the Government...over a 5 year period, without interest commencing with a bulk payment of US$2.8 million held at Inter Maritime Bank

- Foster Wheeler: 100% of the currently outstanding...debt will be repayable by the Government...over a 5 year period without interest

- IHI: 100% of the currently outstanding...debt will be repayable by the Government...over a 15 year period (commencing after repayment in full of the Foster Wheeler Debt), without interest

Paragraph 9 states that the GOAB will provide the following collateral which is a flow of funds otherwise known as the consumption tax that is paid to the GOAB, indirectly from the consumers to the dealers and then to West Indies Oil Company (WIOC) owned indirectly by Bruce Rappaport who imports the gas, diesel, propane and aviation gas into Antigua for sale to the dealers:

- For the first 5 years ending December 1994, all taxes on gas, diesel, propane and aviation gas up to US$5.44 million per year or US$453,333.33 per month plus $2.8 million presently on deposit with Inter Maritime Bank (Rappaport's bank in Switzerland) and which should be paid to Credit Suisse

- For the 15 years from January 1995 to December 2010, all the same taxes up to US$3.266 million per year or US$272,166.66 per month

The repayment of the IHI debt did not start until after the Foster Wheeler debt had been repaid in full. In a May 9, 1990 letter, K. Hurst wrote to D. Woodroffe at APUA to advise that Rappaport had completed his negotiation of both the Foster Wheeler and Credit Suisse loans with the source of funds for the loan repayments to be made from the proceeds of the GOAB revenue or consumption tax from WIOC. Hurst then advised that "IHI is said to agree to forego any additional interest also and await the paying off of Foster Wheeler after which they will be paid off within fifteen years from the said source...Hence, interest does not cease as of now but from May 1997...Attached is a copy of letter from Swiss American Bank advising of the remittance of the funds to Bruce Rappaport's Account for unward transmission to IHI and Foster Wheeler".

As we will note later in December 1996, the GOAB paid the funds on a monthly basis to Rappaport in Bermuda and from there the payments would be made to the two creditors.

4

## CORPORATE STRUCTURE of SWISS AMERICAN at 1990

Bruce Rappaport of                              Bank of New York
Geneva, Switzerland
Owns 72% of                                     Owns 28% of

Bank of New York-Inter Maritime Bank
Based in Geneva, Switzerland
Owns 100% of

Swiss American Holding Company
Based in Panama
Owns 100% of

**Swiss American Bank** (SAB)                   **Swiss American National Bank**
based in Antigua Offshore bank                  based in Antigua, a domestic bank

In April 2002 SAB was sold to                   In May 2000 SANB was sold for $13.5 million
Global Bank of Commerce Ltd                     to Antigua Barbuda Investment Bank Ltd

Hurst has advised that he believes IHI was aware of the need to wait for four years. Nonetheless, on November 18, 1994 K. Nomura from IHI wrote to Lester Bird, as Prime Minister with copies to Minister Yearwood and Keith Hurst as Financial Secretary regarding the loan for the Crabbs Power and Desalination Plant to advise that "As instructed in your letter dated January 19, 1990 that Mr. Rappaport has been accorded the power to negotiate the subject matter on behalf of your Government, to date we have submitted all correspondences to Mr. Rappaport.  We regret to say, however, that we have received none of any official response to the following letters, despite our repeated efforts to expedite his actions".  He then states that the total debt already due to November 1, 1994 is US$31,906,875.  This amount excludes the interest due on the delayed payments.

Two years later, on October 23, 1996 K. Iijima from IHI wrote to Lester Bird, as Prime Minister with copies to Minister Yearwood and Keith Hurst as Financial Secretary regarding the loan for the Crabbs Power and Desalination Plant to advise that they "are seriously concerned about nonperformance of the letter of guarantee on the subject Project...we have never found out any effort by Antigua Government to fulfill your obligation, paying the outstanding installment, under the Contract since May 1988, which was your last payment".  He states that the total overdue amount is US$37,083,375.  This amount excludes the interest due on the delayed payments.

Lester Bird responded on November 18, 1996 to IHI to advise that the GOAB had appointed "Bruce Rappaport of Geneva as our official representative with full authority to meet with you and conclude a resolution of our indebtedness".

On the next day, November 19, 1996, the GOAB issued an addendum to the Power of Attorney dated March 16, 1990 and given to Bruce Rappaport to state that the GOAB wished to extend the period of the outstanding claim of IHI to 20 years from 15 years in order to make the repayment terms easier. The Addendum is signed by the then Prime Minister Lester Bird and Minister John St. Luce.

On December 9, 1996 Lester Bird issued a memo to John St. Luce, Minister of Finance and stated the following in regard to the Power of Attorney given to Rappaport on November 19, 1996 "to negotiate the settlement of Government's debt to IHI over a 20-year period at US$403,334 per month, kindly ensure that with effect from 30 November 1996 no portion of these funds are utilized for any other purpose...With effect from 31 December 1996, the monthly sum of US$403,334 paid to **Swiss American National Bank** should be remitted by standing order to "Bruce Rappaport in trust for the Government" to a bank account designated by him at the Bank of Bermuda"

(The earlier monthly loan repayments were made by the GOAB to Rappaport in the amount of US$453,334 and then from Rappaport at the Bank of Bermuda to Credit Suisse for $6,194,634 and Foster Wheeler for $20,000,000 between April 12, 1990 and November 15, 1994 totaling $26,194,634. When Lester Bird says 'no portion of these funds' it is understood that he means the funds from the consumption tax)

On the same day, December 9, 1996 Lester Bird wrote to Ken Fisher at **Swiss American National Bank** "I refer to the Government's account number 722190. You will recall that last year, I instructed...that the sum of US$453,334 which was being transferred to an account at the Bank of Bermuda...should be suspended...to settle certain debts outstanding to IHI of Japan, you are hereby instructed to resume transfers to an account at Bank of Bermuda of "Bruce Rappaport in trust for the Government" at the rate of US$403,334 per month...from 31 December 1996".

A December 10, 1996 fax from "Antigua & Barbuda to 0012684622361" entitled "Note on IHI Debt" where the 'to and from' persons are unidentified states that the total due according to the IHI letter of April 1995 of US$42,245,000 (principal and interest) could be as high as US$91,807,670 if one included the deferred interest and penalties. This amount was detailed as unpaid principal of US$60,957,157, deferred interest of US$14,530,143 and penalty on interest of US$16,320,370. The fax also stated that this excluded "foreign currency fluctuations which the Japanese might insist upon".

It continues:

- "This negotiation, therefore, needs somebody who can hold out to IHI the prospect of new contracts. We are not in that position. It also needs some body who is credible, and we are not. If we push Rappaport too far, he may well walk away and then the deal that has been struck for March and on a continuing basis will be lost...If we take 8% on US$29 million over 9 years since the February 1988 default, that is US$20 million more without talking penalties we are already

6

up to US$49 million. We then have to add a further 20 years of interest...assume 3% interest...and we are at US$80 million for the pay out of principal and interest...If you calculate US$350,000 per month...over 20 years, we get to US$84 million. The deal might just be done, but only if Rappaport gets them to forgive penalties for deferred interest, forgive foreign exchange losses and accept 3% interest on an ongoing basis".

From the December 10, 1996 fax one might conclude, given the reference to the 3% interest rate and a the monthly amount of US$403,334 starting on December 31, 1996 in the December 9, 1996 memo from Lester Bird to his Minister of Finance, John St. Luce, that the Rappaport negotiation with the GOAB had already been concluded even though the Rappaport negotiation with IHI did not occur until August 1997. Perhaps it occurred at the time that Lester Bird and John St. Luce signed the addendum to the Power of Attorney given to Rappaport dated November 19, 1996. The September 11, 1997 Settlement Agreement between GOAB and IHI Debt Settlement Company, operating under the control of Bruce Rappaport, also refers to a 3% interest rate and a monthly payment of US$403,334 starting on December 31, 1996.

Consistent with the amounts in the same December 10, 1996 fax is the components of the debt that Rappaport presents in his November 3, 1999 explanatory letter to Lester Bird where he stated that IHI had claimed the maximum amount of debt: "When we got involved with the IHI negotiations, the claims of IHI...were as follows" as at August 31, 1997:

| | |
|---|---|
| Principal | US$28,262,500 |
| Contractual interest: | 11,602,500 |
| Deferred interest | 16,898,765 |
| Total | $56,763,765 |
| Interest Rate | 8% |
| Term | 25 years |

He continues in the same letter "As you know from the agreement, repayment of IHI's full demand of US$56,763,765 would have cost GOAB, at 8%, $133,169,013 over twenty-five years".

By calculation, twenty-five years represents 300 months and 300 times the amount of US$443,897 equals the amount of US$133,169,013.00 at 8% for 25 years that Rappaport represents as being "IHI's full demand". The amount of $443,897 is repeated below in the September 1997 Agreement.

The September 11, 1997 Agreement between GOAB and IHI Debt Settlement Company, signed by Lester Bird and John St. Luce for GOAB and Bruce Rappaport for IHI Debt Settlement Company also repeats the amount of "IHI's full demand":

- "Payment of the past due debt of US$56,763,756 without interest (which would require US$443,897 monthly for 25 years for a full settlement of

7

US$133,169,013) is hereby assigned to IHI Debt Settlement Co. which shall have the responsibility to settle the debt with IHI by monthly payments over a period of 25 years beginning 31 December 1996..."

However, the Agreement acknowledges that Rappaport has been able to reduce the amount of the debt such that the monthly payment is now US$403,334:

- "Whereas Mr. Rappaport has negotiated terms with both IHI and MITI for the settlement of the IHI debt over 25 years on the basis of monthly payments of US$403,334 and has established an arrangement with IHI Debt Settlement Co. as a mechanism for making all payments"

And the Agreement confirms that this amount is to be paid for 25 years as follows:

- "NOW, THEREFORE, the GOAB accepts and agrees as follows: Such a settlement is contingent upon the GOAB paying to IHI Debt Settlement Co., on a monthly basis, the sum of US$403,334 for the said period of 25 years...to IHI Debt Settlement Co. (c/o Bank of Bermuda, Hamilton, Bermuda)...for the next 24 years and 3 months beginning on 15th September 1997..."

Keith Hurst, Financial Secretary in the Ministry of Finance issued a memo dated September 18, 1997 to John St. Luce, the Minister of Finance criticizing a September 10, 1997 draft of this Settlement Agreement with these terms. He states that the GOAB is not responsible for any 8% penalty and further states that the total payment should be US$91,276,515.57 and not US$133,169,013 and the repayment should be US$302,276.22 and not US$403,334.00. He concludes

- "therefore we cannot recommend signing of the Agreement as the difference is too great"

In a subsequent letter dated November 27, 1998 from Keith Hurst to the Manager at Barclays Bank PLC in Antigua, Hurst repeats the time period of 24 years and 3 months and the Guarantee "the Central Government has given an Irrevocable Letter to **Swiss American Bank** to remit the amount of US$403,334 by the last day of every month from the West Indies oil Consumption tax Revenue for the next 24 years and 3 months beginning 15th September 1997 to IHI Debt Settlement Co."

As a result, the total debt of US$133,169,013 (a US$443,897 monthly payment) that Rappaport says IHI had claimed, he now claims to have reduced to the amount of US$120,946,310 (a US$403,334 monthly payment), an apparent saving of some US$12 million. However, this is significantly more than the total debt of about US$60 million that IHI had confirmed to Pannell Kerr and the APUA in February 1999 and October 1999. This raises the next question: who received or was to receive the additional US$61 million beyond the total debt of about US$60 million due IHI.

8

## CLARIFICATION IS SOUGHT BY THE AUDITORS

Notwithstanding the above September 1997 Agreement, Pannell Kerr has advised that neither the APUA nor Pannell Kerr were aware of the renegotiated terms until receipt from IHI of the February 5, 1999 dated audit confirmation for the December 1998 fiscal year that set out the new renegotiated terms of repayment.

K. Nomura of IHI faxed this letter on February 5, 1999 to Pannell Kerr with a copy to Roger Tonge, Senior Accountant, APUA, to confirm that as at December 31, 1998 the loan principal (that included interest) was now **US$42,120,514**, interest was 3% and monthly payments were **US$199,740.25** payable for 25 years, starting from September 1997 and ending in August 2022. At this time, the accounting records of APUA still reflected the terms of repayment on the original loan.

According to Pannell Kerr, their need for further clarification was directed to Roger Tonge of APUA who, along with Peter Benjamin and Elsworth Martin of the APUA approached Keith Hurst. Hurst wrote to Rappaport on June 2, 1999 requesting a copy of the final September 1997 Settlement Agreement to show the current status of the loan. On July 26, 1999 Hurst wrote to Peter Benjamin at APUA to enclose a copy of his September 18, 1997 memo to the Minister of Finance where he states "Despite my advice, the repayment schedule was signed". He advised that he had written to Rappaport and now asked if APUA had received any details from IHI. Benjamin wrote back on July 29, 1999 to send Hurst the above IHI audit confirmation, the only information in his possession.

Meanwhile, this issue had come to the attention of Minister Robin Yearwood. Even though he had been the Minister of Public Utilities since 1988 he nonetheless reached out to Asot Michael, Chief of Staff in the Office of the Prime Minister, with the word "URGENT" appearing on a fax issued to Asot Michael. On July 23, 1999 Asot Michael was away and Robin Yearwood on APUA letterhead faxed to Asot Michael at fax #171 493 3341 room #602 correspondence marked "URGENT". It included the January 29, 1999 letter issued by Pannell Kerr to IHI requesting the audit confirmation and the above IHI response in their letter of February 5, 1999.

Keith Hurst in the Ministry of Finance also faxed to "Asot Michael Prime Minister's Office" his letter dated August 6, 1999 that he had written to Bruce Rappaport with a copy to Lester Bird regarding the IHI debt. The topic was the IHI audit confirmation.

Lester Bird also wrote a letter on September 21, 1999 to Matthew Stevenson at Inter Maritime Bank in Geneva regarding the IHI audit confirmation stating "As Prime Minister, I must be in a position to justify all financial decisions on this loan, hence, I need urgent acceptable responses and or adjustments of the repayment".

Meanwhile, Roger Tonge of APUA was still trying to get answers. On September 16, he wrote to IHI requesting further information. On October 12, 1999 **T. Kikuchi of IHI** faxed to Roger Tonge at APUA with a copy to Pannell Kerr, the revised amortization

9

schedule entitled "Progress Status for Debt Refund" that was based on a loan principal amount of US$42,120,514.87, interest of US$17,801,560.13 for a **total debt due IHI of US$59,922,075.00 by August 31, 2022.** With this new information, Pannell Kerr adopted the revised terms and completed their audit. A Pannell Kerr working paper reported the new IHI Long Term Debt loan of US$42,120,514.87 and noted "The Debt Settlement Agreement was signed on September 14, 1997 between the Government of Antigua/Barbuda and IHI but the entries were not booked until 1999...The loan is secured by an Irrevocable letter from the Government of Antigua/Barbuda to Swiss American Bank to remit the monthly amount from the West Indies Oil Consumption Tax Revenue". Pannell Kerr advised that neither APUA nor Pannell Kerr has a copy of the September 14, 1997 Agreement.

Lester Bird was still seeking an explanation from Rappaport regarding the unaccountable balance of US$61 million that was to be paid over the 25 years. The total amount due IHI by August 31, 2022 is US$59,922,075 and when deducted from the Agreement amount of US$120,946,310 leaves an unaccountable balance of US$61,024,235 that Lester Bird and John St. Luce on behalf of the GOAB had agreed to pay to IHI Debt Settlement Company. Consequently, the savings of US$12 million was now replaced with an unaccountable balance of US$61 million, assuming a full 25 year payout. And as already stated, this raises the next question: who received or was to receive the additional US$61 million beyond the total debt of about US$60 million due IHI.

## THE RAPPAPORT LETTER OF EXPLANATION

### Background

Minister Robin Yearwood had applied the word "URGENT" in capital letters in his July 23, 1999 fax to Asot Michael. Keith Hurst in the Ministry of Finance had also faxed to "Asot Michael Prime Minister's Office" his letter dated August 6, 1999 that he had written to Bruce Rappaport with a copy to Lester Bird regarding the IHI debt. The topic was the IHI audit confirmation. Hurst stated:

- according to the APUA they are claiming a loan reduction on their IHI debt of US$403,334 per month, but the auditor confirmation received by Pannell Kerr refers to the amount of US$199,740.25 being received by IHI on account of its loan with the GOAB.

- "As there appear to be a great discrepancy between what we are paying and what IHI states that we should be paying, we would appreciate receiving a copy of the signed agreement with IHI for the rescheduling of the loan of US$42,120,514.87 in order that...the accounts can be reconciled"

Hurst advised that Rappaport never responded to his letters.

Meanwhile, on August 22, 1999 New York Times published an article that referred to Bruce Rappaport as a Swiss-Israeli businessman, at the intersection of illicit Russian

10

money and the Bank of New York, with a close relationship to Israel's Labor Party, the Reagan administration and U.S. intelligence that included a curious shipment of weapons through a melon farm in Antigua to Colombian cocaine kingpins.

As noted, Prime Minister Lester Bird on September 21, 1999 wrote to Matthew Stevenson at Inter Maritime Bank in Geneva due to the IHI audit confirmation stating:

- "By September 1997 the GOAB debt to IHI increased to US$56,763,756 which, if paid over 25 years term with interest and penalties amounted to US$133,169,013...It is implied that GOAB was obligated to make payments of US$443,897 monthly for a period of not less than 25 years to service the debt...

- GOAB entered into an agreement with IHI Debt Settlement Co. whereby GOAB debt to IHI was assigned...GOAB agreed to make payments of US$403,334 per month to IHI Debt Settlement Co. for a period of 25 years commencing 31st December 1996...

- For remuneration...you would get a fee as set out in the Power of Attorney...and shall be recovered monthly from the sum of US$403,334...

- From the Auditors confirmation Pannell Kerr Forster, it would appear that you negotiated an agreement with IHI for the settlement of the GOAB debt whereby the principal amount outstanding would be set at US$42,120,514 to be paid at an interest rate of 3% per annum by monthly payments of US$199,740 commencing in September 1997.

- However, it appears that you reported a negotiated settlement to the GOAB whereby IHI would waive all claims against us in consideration of a monthly payment of US$403,334 for 25 years for the period commencing 31st December 1996. There appears to be some discrepancy here which I am sure can be easily explained.

- As Prime Minister, I must be in a position to justify all financial decisions on this loan, hence, I need urgent acceptable responses and or adjustments of the repayment"

**The Rappaport Response**

Bruce Rappaport, on letterhead 'The Ambassador of Antigua and Barbuda' provided Lester Bird on November 3, 1999 with **FIVE** reasons to explain the monthly amount of US$403,334 as follows:

- **FIRST:** The GOAB had agreed to pay him fees of 7% totaling US$2,640,000 divided between Credit Suisse for $1.1 million and Foster Wheeler for $1.54 million for previous debt negotiations but these fees were never paid. In addition, he stated that in settling these debts he also incurred foreign exchange losses of

11

US$2,847,323. He continued "When we agreed on the November 19, 1996, that my power of attorney would extend...to...IHI, it was agreed...that all monies...owed to me ($5,487,323), would be repaid from the monthly proceeds of the IHI debt Settlement".

- **SECOND**: He continued "When we got involved with the IHI negotiations, the claims of IHI...were as follows:

| As of August 31, 1997: | |
|---|---|
| Principal | US$28,262,500 |
| Contractual interest (8% p.a.) | US$11,602,500 |
| Deferred interest (8% p.a.) | US$16,898,765 |
| **Claim, as of August 31, 1997:** | **US$56,763,765** |
| Currency losses at IHI: | (an additional $15,000,000)" |

He continued "As you know from the agreement, repayment of IHI's full demand (US$56,763,765) would have cost GOAB, at 8%, $133,169,013 over twenty-five years". He then described how he convinced IHI to:

- accept a deferred interest rate of 2% rather than 8% that reduced the above amount of US$56,763,756 to US$44,120,514

- accept a payment of $2,000,000 at the time of signing the settlement agreement on September 14, 1997 as a sign of goodwill that reduced the above amount of US$44,120,514 to US$42,120,514

- accept an interest rate of 3% instead of the 8% for the 25 years

The revised terms as at August 31, 1997 became:

| Principal | $42,120,514 |
|---|---|
| Interest | 3% |
| Term | 25 years |

(Note: Rappaport did not provide the calculation that shows that the amount of $42,120,514 at 3 % for 25 years equals $59,922,075)

Bruce Rappaport then detailed the allocation of the components of the monthly amount of US$403,334 and here we see reasons **THREE** and **FOUR** as follows:

- US$133,837.14     to Bruce Rappaport to settle fees for past debt settlement negotiations **(FIRST)**

- US$199,740.25     to IHI for the loan repayment **(SECOND)**

12

- US$56,333        to Bruce Rappaport "to settle this (IHI) debt on such favorable terms, and as anticipated in the agreement (clause 6), we have monthly costs of $56,333" **(THIRD)**

- US$13,244        to Bruce Rappaport for "my monthly success fee" **(FOURTH)**

**THIRD:** The introduction of monthly costs on the part of Bruce Rappaport to which no reference is made in either the Settlement Agreement or the Power of Attorney (refer to Clause 6 below).

**FOURTH:** The introduction of his monthly success fee is accepted to be the fee that is based on the Power of Attorney and referred to in the Settlement Agreement.

**FIFTH:** The introduction of a previously undisclosed revised term of repayment. The Settlement Agreement and all references thereto speak to a term of 25 years for the payment of the amount of US$403,334. For the first time, Rappaport states that effective February 1, 2001, the GOAB can reduce its monthly payment to US$269,317 after repayment of the fees due Rappaport relating to Credit Suisse (US$1.1 million), Foster Wheeler (US1.54 million) and Foreign Exchange (US$2,847,323).

This reduction in the number of years significantly reduced the total GOAB debt due IHI Debt Settlement Company by some US$33 million, from the previously identified US$120,946,310 to US$87,496,032.

Appendix 1 has a breakdown by item of the allocation of the amounts of US$120,946,310 and US$87,496,032 and the time periods. As we see from Appendix 1, the US$33 million would have been paid to Rappaport.

**Rappaport Remuneration**

Mr. Hurst advised that the "Minimum Terms" mean the least of what Rappaport had to accomplish before the 6% provision would be applicable. For the IHI loan he had to obtain at least a period of at 15 years at 8% on all types of interest, to be paid only after the Foster Wheeler debt was repaid by GOAB. He advised that Rappaport's remuneration was to be:

- For Credit Suisse 6% of the US16 million or $960,000 but he received $1.1 million that should include interest

13

- For FW 6% of all interest savings including the deferred interest, he received $1.54 million that should include interest
- For IHI 6% of all interest savings including the deferred interest, he is to receive over 25 years $3,973,200 that includes interest

The Clause 6 reference above does not match the Power of Attorney dated March 16, 1990 and the Addendum dated November 19, 1996.  Clause 8 of the Power of Attorney states regarding IHI "Attorney shall be entitled to receive from the Government...any savings to the Government resulting from a...IHI Settlement or terms more favourable than specified on attached Schedule 1".  Schedule 1 states "Minimum Term – IHI Debt One hundred percent of the currently outstanding IHI Debt will be repayable by the Government to IHI amortized over a fifteen year period...without interest.  In the event of a default by the Government in the payment of any installment of the IHI Debt pursuant to the IHI Settlement, all amounts paid by the Government under such settlement may be forfeited, the settlement cancelled and the currently outstanding IHI Debt will thereafter by fully payable IHI".  Consequently the clause 6 reference does not appear to support the statement of Rappaport.

**CONCLUSION**

Earlier we stated "Consequently, the savings of US12 million was now replaced with an unaccountable balance of US$61 million, assuming a full 25 year payout".  It appears that the unaccountable balance of US$61 million was to be paid to Bruce Rappaport, in full knowledge of at least Lester Bird, Prime Minister and John St. Luce, Minister of Finance and in general terms Asot Michael, Chief of Staff in the Prime Minister's Office, Robin Yearwood, Minister of Public Utilities and responsible for APUA.  Bruce Rappaport is an Ambassador for GOAB and in his private capacity, the person in authority for Swiss American Bank, Swiss American National Bank and IHI Debt Settlement Company.

As a result of the IHI audit confirmation issued to Pannell Kerr, the unaccountable balance of US$61 million was reduced by US$33 million to an approximate amount of US$28 million.  From the date of the first payment of US$403,334 in December 1996 to August 2004, Rappaport has been paid the sum of US$6,700,857 for his past fees and foreign exchange, the sum of US$5,182,636 for "costs" and the sum of US$1,218,448 for his "success fee".

It is important to address the "costs" claimed by Rappaport of US$16,899,900 that is over 28% of the revised loan repayment amount.  As noted, to date the sum of US$5,182,636 for "costs" has been paid to Rappaport.  Realistically, the work involved to administer the payments from GOAB to IHI Debt Settlement Co Ltd and from there to IHI is minimal.  Once a month, the incoming GOAB payment needs to be processed and a payment has to be made to IHI.  Big 4 accounting firms and others offer this service for a minimal fee.  For example, KPMG Switzerland provides this type of service.  Along with an annual audit the total cost would not exceed $25,000 per year compared to Rappaport's cost of $675,996 per year at $56,333 per month.

14

Appendix 2 is a section entitled 'LISTING OF OUR FINDINGS NOT IN THE NORMAL COURSE OF BUSINESS' that further addresses this sequence of events. The items are listed here:

- GOAB public officials did not act in the best interests of the public: with the deficit financial position of GOAB, both Lester Bird, Prime Minister and John St. Luce Minister of Finance should have negotiated directly with IHI; the GOAB negotiation with Bruce Rappaport should have been done during the IHI/Rappaport negotiation; the "costs" paid to Rappaport is inconsistent with their Power of Attorney agreement; the advice of Keith Hurst, Financial Secretary in the Ministry of Finance to Minister St. Luce to reject the terms September 1997 Agreement was ignored; the reporting to Asot Michael, Chief of Staff in the Office of the Prime Minister by Robin Yearwood, Minister of Public Utilities who was responsible for the APUA and the debt; the failure of Minister Yearwood to advise APUA of the renegotiation both before and during the disclosure of the audit discrepancy; the willingness of Rappaport to materially reduce the terms of the debt by $33 million; personal involvement of Lester Bird, John St. Luce, Asot Michael and Robin Yearwood in the debt of a state agency without input from the state agency.

Consequently, we seek to determine whether Rappaport has retained all of these funds for his own use, in particular the "costs" or whether any of these funds were paid to one or more of the above persons in the GOAB.

Examination of the available documentation within the GOAB and at the Antigua Barbuda Investment Bank Ltd shows that these payments have been made to the following financial institutions:

**Prior to October 2003:**
Examination of the documentation from the Antigua Barbuda Investment Bank Ltd discloses the monthly payments of US$403,334 and then US$269,317.00 being paid by the GOAB to the following financial institution:

| | |
|---|---|
| Bank: | Bank of N. T. Butterfield, Hamilton, Bermuda |
| Swift address | BNTBBMHMM |
| Account Party | IHI Debt Settlement Company |
| Account # | 20006840517560100 |

**Subsequent to October 2003:**
On October 16, 2003 Alain Fustec on the letterhead of IHI Debt Settlement Company Ltd., c/o Petrotrade S.A.M., Park Palace, 6 Impasse de la Fontaine, Monte Carlo, Monaco wrote to the Financial Secretary to advise "with immediate effect" that all future payments under the September 1997 Agreement be made to the following account:

| | |
|---|---|
| Bank: | Wachovia Bank N.A., Miami, Florida |
| Swift address | PNBPUS33 |

15

|            |                                                              |
|------------|--------------------------------------------------------------|
| ABA #      | 063000021                                                    |
| Account Party | Debt Settlement Administrators LLC                        |
| Account #  | 20000 1668 3422                                              |
| Reference  | IHI Debt Settlement Co. Limited Administration Agreement     |

Examination of the documentation from the Antigua Barbuda Investment Bank Ltd discloses the monthly payment of US$269,317.00 being paid by the GOAB to the following financial institution:

|            |                                      |
|------------|--------------------------------------|
| Bank:      | Wachovia Bank N.A., Miami, Florida   |
| ABA#       | 063000021                            |
| Account #  | 20000 1668 3422                      |
| Account Party | Debt Settlement Administrators LLC |

16

**APPENDIX 1**

**COMPARISON OF TOTAL DEBT AMOUNT BEFORE/AFTER IHI CONFIRMATION DATED FEBRUARY 5, 1999**

Based upon the allocation of the monthly amount set out in the Rappaport letter of November 3, 1999, the payment of the monthly amount of US$403,334 for 25 years as confirmed in the September 1997 Agreement would have resulted in a total of US$120,946,310 being paid over the 25 years before the IHI audit confirmation disclosed the discrepancy:

| Months | Amount | Total | Purpose |
|---|---|---|---|
| 300 months @ | $199,740.25 = | $59,922,075 | to repay the entire IHI debt |
| 300 months @ | $56,333.00 = | $16,899,900 | to pay Rappaport for costs |
| 300 months @ | $13,244.00 = | $ 3,973,200 | to pay Rappaport success fee |
| 300 months @ | $133,837.14 = | $40,151,142 | to pay Rappaport for past fees and foreign exchange |
| Total | $403,154.39 | $120,946,310 | |

As a result of the IHI audit confirmation, the total was reduced by US$33,459,278, a sum that was attributable to Rappaport past fees, to a revised total debt amount of US$87,496,032:

| Months | Amount | Total | Purpose |
|---|---|---|---|
| 300 months @ | $199,740.25 = | $59,922,075 | to repay the entire IHI debt |
| 300 months @ | $56,333.00 = | $16,899,900 | to pay Rappaport for costs |
| 300 months @ | $13,244.00 = | $ 3,973,200 | to pay Rappaport success fee |
| 50 months @ | $134,017.14 = | $ 6,700,857 | to pay Rappaport for past fees and foreign exchange |
| Total | $403,334.00 | $87,496,032 | |

**SUMMARY OF THE LAW**

The detailed facts as disclosed in this document clearly establishes the likelihood of serious criminal behaviour for an extended period of time by the subject persons Lester Bird, Asot Michael, John St. Luce, Robin Yearwood and Bruce Rappoport, at a time when the first four subject persons held high public office within the government of Antigua and Barbuda, and the fifth subject person was a major investor in the State of Antigua and Barbuda, and appointed an ambassador by the said government.

The criminal offences for which these persons may be charged include but are not limited to
(1)     Misbehavior or misconduct in public office, contrary to Common Law and;

17

(2)    Conspiracy to defraud the Government of Antigua and Barbuda of Revenue lawfully paid out by the Antigua and Barbuda Treasury and unlawfully diverted to divers accounts, and fraudulently converted to the use of the subject persons.

**ASSISTANCE REQUESTED:**

> Bank:              Wachovia Bank N.A., Miami, Florida
> Swift address   PNBPUS33
> ABA #            063000021
> Account Party  Debt Settlement Administrators LLC
> Account #        2000016683422
> Reference        IHI Debt Settlement Co. Limited Administration
>                        Agreement

TO PRODUCE THE FOLLOWING:

All documents relating or incident to the following bank account:

> Debt Settlement Administrators LLC
> Wachovia Bank N.A.,
> Miami, Florida

Such production should include, but not be limited to the following documents:

1.    Account opening information including corporate information, signature card, company management agreement

2.    All deposit tickets and credit memoranda and all other documents, including wire transfers that relate to the deposit or credit of monies or funds to the above account in time near the date for the following monthly deposits:

> from October 1, 2003 or when such deposits started to September 30, 2004 inclusive with the monthly amount of $269,317 from the Government of Antigua & Barbuda

3.    All checks, all withdrawal tickets, all debit memoranda and all other documents, including wire transfers, relating to the withdrawal or debit of the above deposit of monies or funds in amounts greater than $5,000 from the above bank account.

4.    All bank statements of account for the period of time beginning October 1, 2003 and ending September 30, 2004.

5.    All cashier's checks purchased with the proceeds from said deposits.

18

6.    Certificates of deposit, bonds, and trust account records and standing orders.

7.    Passport copies for beneficial owners
8.    Client profiles, call reports, visitation reports, due diligence memoranda and other memoranda
9.    An analysis listing the source of the deposits and the payees for the disbursements
10.   Annual Financial Statements and any other accounting
11.   Security Evaluation statements
12.   Statements of current holdings relating to this account if still open

The assistance outlined above is required in regard to the ongoing criminal investigation into the activities of Lester Bird, Asot Michael, John St. Luce, Robin Yearwood and Bruce Rappaport.

We thank you in advance for your valuable co-operation in this matter.

Very truly yours,

**JUSTIN L. SIMON Q.C**
**Attorney General**
**And Minister of Justice & Legal Affairs**
**Central Authority**

19

1

| 105TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>105–24 |
|---|---|---|

## MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS WITH ANTIGUA AND BARBUDA, DOMINICA, GRENADA AND ST. LUCIA

_____

MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATIES BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENTS OF FOUR COUNTRIES COMPRISING THE ORGANIZATION OF EASTERN CARIBBEAN STATES: ANTIGUA AND BARBUDA, SIGNED AT ST. JOHN'S ON OCTOBER 31, 1996; DOMINICA, SIGNED AT ROSEAU ON OCTOBER 10, 1996; GRENADA, SIGNED AT ST. GEORGE'S ON MAY 30, 1996; ST. LUCIA, SIGNED AT CASTRIES ON APRIL 18, 1996



SEPTEMBER 3, 1997.—Treaties were read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

_____

U.S. GOVERNMENT PRINTING OFFICE

39–118                WASHINGTON : 1997

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *September 3, 1997.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaties Between the Government of the United States of America and the governments of four countries comprising the Organization of Eastern Caribbean States. The Treaties are with: Antigua and Barbuda, signed at St. John's on October 31, 1996; Dominica, signed at Roseau on October 10, 1996; Grenada, signed at St. George's on May 30, 1996; St. Lucia, signed at Castries on April 18, 1996. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaties.

The Treaties are part of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activity more effectively. They should be an effective tool to assist in the prosecution of a wide variety of crimes, including "white-collar" crime and drug trafficking offenses. The Treaties are self-executing.

The Treaties provide for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaties includes: taking of testimony or statements of persons; providing documents, records, and articles of evidence; serving documents; locating or identifying persons or items; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to forfeiture of assets, restitution to the victims of crime, and collection of fines; and any other form of assistance not prohibited by the laws of the Requested State.

I recommend that the Senate give early and favorable consideration to these Treaties and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

# LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, June 18, 1997.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you treaties on mutual legal assistance (MLATs) between the Government of the United States of America and the Governments of four countries comprising the Organization of Eastern Caribbean States (OECS). The treaties are with: Antigua and Barbuda, signed at St. John's on October 31, 1996; Dominica, signed at Roseau on October 10, 1996; Grenada, signed at St. George's on May 30, 1996; and St. Lucia, signed at Castries on April 18, 1996. I recommend that these treaties be transmitted to the Senate for its advice and consent to ratification.

The OECS MLATs, the texts of which are identical, contain all essential provisions sought by the United States. The treaty with Antigua and Barbuda is accompanied by an exchange of diplomatic notes (described below), which relates to Article 1 of the Treaty and which forms an integral part of the treaty. They represent part of a concerted effort by the Department of State and the Department of Justice to develop modern legal assistance relationships in order to enhance the United States' ability to prosecute serious offenders including, especially, narcotics traffickers. The Treaties are designed to be self-executing and will not require implementing legislation. In recent years, similar bilateral treaties have entered into force with a number of other countries.

Article 1 sets forth a non-exclusive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents; records and articles of evidence; serving documents; locating or identifying persons; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution to the victims of crime and collection of fines; and rendering any other form of assistance not prohibited by the laws of the Requested State.

The scope of the Treaty includes not only criminal offenses, but also proceedings directly related to criminal matters, which may be civil or administrative in nature. Article 1(3) states that, except as otherwise provided in the Treaty, assistance shall be provided without regard to whether the conduct involved would constitute an offense under the laws of the Requested State.

(V)

VI

The Treaty with Antigua and Barbuda includes an exchange of diplomatic notes which confirms that assistance under the Treaty includes criminal tax matters, notwithstanding that Antigua and Barbuda has no income tax legislation at this time. The United States stated in its note that it does not intend to seek assistance under the Treaty for civil and administrative income tax matters that are unrelated to any criminal matter. The exchange of notes constitutes an integral part of this treaty.

Article 1(4) states explicitly that the Treaty is not intended to create rights in private parties to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For each of the other respective States, the Central Authority is the Attorney General or a person designated by the Attorney General. The article provides that the Central Authorities shall communicate directly with one another for the purposes of the Treaty.

Article 3 sets forth the circumstances under which a Requested State's Central Authority may deny assistance under the Treaty. A request may be denied if it relates to a military offense that would not be an offense under ordinary criminal law. In addition, a request may be denied if its execution would prejudice the security or similar essential public interests of the Requested State, or if it is not made in conformity with the Treaty. Further grounds for denial are that the request relates to a political offense (a term expected to be defined on the basis of that term's usage in extradition treaties) or that execution of the request would be contrary to the Constitution of the Requested State. This latter provision is similar to clauses in other United States mutual legal assistance treaties. e.g., Jamaica.

A final ground for denial of assistance is that the request is made pursuant to provisions of the treaty governing search and seizure (Article 14) or asset forfeiture (Article 16) and relates to conduct which would not be an offense if it has occurred in the Requested State. Thus, while "dual criminality" in general is not a prerequisite for assistance under this treaty, the Requested State does retain discretion to deny a request under Articles 14 and 16.

Before denying assistance under Article 3, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions as the Central Authority of the Requested State deems necessary. If the Requesting State accepts assistance subject to these conditions, it is required to comply with the conditions. If the Central Authority of the Requested State denies assistance, it is required to inform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each request. The article permits other forms of request in emergency situations but requires written confirmation within ten days thereafter unless the Central Authority of the Requested State agrees otherwise.

VII

Article 5 requires the Central Authority of the Requested State to execute the request promptly or to transmit it to the authority having jurisdiction to do so. It provides that the competent authorities of the Requested State shall do everything in their power to execute a request, and that the judicial or other competent authorities of the Requested State shall have authority to issue subpoenas, search warrants or other orders necessary to execute the request. The Central Authority of the Requested State must make all arrangements for and meet the costs of representation of the Requesting State in any proceedings arising out of an assistance request.

Under Article 5(3), requests are to be executed in accordance with the laws of the Requested State except to the extent that the Treaty provides otherwise. However, the method of execution specified in the request is to be followed except insofar as it is prohibited by the laws of the Requested State. If the Central Authority of the Requested State determines that execution of the request would interfere with an ongoing investigation, prosecution or proceeding in that State, it may postpone execution or, after consulting with the Central Authority of the Requesting State, impose conditions on execution. If the Requesting State accepts assistance subject to conditions, it shall comply with them.

Article 5(5) further requires the Requested State, if so requested, to use its best efforts to keep confidential a request and its contents, and to inform the Requesting State's Central Authority if the request cannot be executed without breaching confidentiality. This provides the Requesting State an opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

This article additionally requires the Requested State's Central Authority to respond to reasonable inquiries by the requesting State's Central Authority regarding the status of the execution of a request; to report promptly to the Requesting State's Central Authority the outcome of its execution; and, if the request is denied, to inform the Requesting State's Central Authority of the reasons for the denial.

Article 6 apportions between the two States the costs incurred in executing a request. It provides that the Requested State shall pay all costs, except for the following items to be paid by the Requesting State: fees of expert witnesses; costs of translation, interpretation and transcription; and allowances and expenses related to travel of persons pursuant to Articles 10 and 11.

Article 7 requires the Requesting State to comply with any request by the Central Authority of the Requested State that information or evidence obtained under the Treaty not be used for proceedings other than those described in the request without its prior consent. Further, if the Requested State's Central Authority asks that information or evidence furnished be kept confidential or be used in accordance with specified conditions, the Requesting State must use its best efforts to comply with the conditions. Once information is made public in the Requesting State in accordance with either of these provisions, no further limitations on use apply. Nothing in the article prevents the use or disclosure of information to the extent that there is an obligation to do so under the Con-

VIII

stitution of the Requesting State in a criminal prosecution. The Requesting State is obliged to notify the Requested State in advance of any such proposed use or disclosure.

Article 8 provides that a person in the Requested State from whom testimony or evidence is requested pursuant to the Treaty shall be compelled, if necessary, to appear and testify or produce items and articles of evidence. The article requires the Central Authority of the Requested State, upon request, to furnish information in advance about the date and place of the taking of testimony or evidence.

Article 8(3) further requires the Requested State to permit the presence of persons specified in the request (such as the accused, counsel for the accused, or other interested persons) and to permit them to question the person giving the testimony or evidence. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity or privilege under the laws of the Requesting State, Article 8(4) provides that the testimony or evidence shall be taken and the claim made known to the Central Authority of the Requesting State for resolution by its authorities.

Finally, in order to ensure admissibility in evidence in the Requesting State, Article 8(5) provides, through the use of forms appended to the Treaty, a mechanism for authenticating evidence that is produced pursuant to or that is the subject of testimony taken in the Requested State.

Article 9 requires that the Requested State provide the Requesting State with copies of publicly available records in the possession of government departments and agencies in the Requested State. The Requested State may further provide copies of records or information in the possession of an executive, legislative, or judicial authority in that State but not publicly available, to the extent and under the same conditions as it would provide them to its own law enforcement or judicial authorities. The Requested State has the discretion to deny such requests pursuant to this paragraph entirely or in part.

Article 9 also provides that no further authentication shall be necessary for admissibility into evidence in the Requesting State of official records where the official in charge of maintaining them authenticates the records through the use of Form B appended to this Treaty.

Article 10(1) provides a mechanism for the Requesting State to invite the voluntary appearance in its territory of a person located in the Requested State. The Requesting State shall indicate the extent to which the expenses will be paid. Article 10(2) states that the Central Authority of the Requesting State has discretion to determine that a person appearing in the Requesting State shall not be subject to service of process or be detained or subjected to any restriction of personal liberty by reason of any acts or convictions that preceded his departure from the Requested State. Under Article 10(3), any safe conduct provided for by this article ceases seven days after the Central Authority of the Requesting State has notified the Central Authority of the Requested State that the person's presence is no longer required, or if the person has left the Requesting State and voluntarily returns to it. An extension of up to

fifteen days for good cause may be granted by the Requesting State's Central Authority in its discretion.

Article 11 provides for temporary transfer of a person in custody in the Requested State to the Requesting State for purposes of assistance under the Treaty (for example, a witness incarcerated in the Requested State may be transferred to the Requesting State to have his deposition taken in the presence of the defendant), provided that the person in question and the Central Authorities of both States agree. The article also provides for voluntary transfer of a person in the custody of the Requesting State to the Requested State for purposes of assistance under the Treaty (for example, a defendant in the Requesting State may be transferred for purposes of attending a witness deposition in the Requested State), if the person consents and if the Central Authorities of both States agree.

Article 11(3) further establishes both the express authority and the obligation of the receiving State to maintain the person transferred in custody unless otherwise authorized by the sending State. The return of the person transferred is subject to terms and conditions agreed to by the Central Authorities, and the sending State is not required to initiate extradition proceedings for return of the person transferred. The person transferred receives credit for service of the sentence imposed in the sending State for time served in the custody of the receiving State.

Article 12 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any document relating to any request for assistance under the Treaty. A request for the service of a document requiring a person to appear in the Requesting State must be transmitted a reasonable time before the scheduled appearance. Proof of service is to be provided in the manner specified in the request.

Article 14 obligates the Requested State to execute requests for search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. It provides that, upon request by the Central Authority of the Requesting State, every official who has custody of a seized item is required to certify, through the use of Form C appended to the Treaty, the continuity of custody, the identity of the item, and the integrity of its condition. No further certification is required. The certificate is admissible in evidence in the Requesting State. Article 14(3) further provides that the Central Authority of the Requested State may impose upon the Requesting State terms and conditions deemed necessary to protect third party interests in items to be transferred.

Article 15 requires the Requesting State's Central Authority, upon request of its counterpart in the Requested State, to return items, including documents, records or articles of evidence obtained in the execution of a request as soon as possible.

Article 16(1) provides that, if the Central Authority of one Contracting Party becomes aware of proceeds or instrumentalities of offenses that are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure, it may so inform the Central Authority of that other Party. If the Party receiving such

x

information has jurisdiction, it may present this information to its authorities for a determination whether any action is appropriate. The Central Authority of the Party receiving such information is required to inform the Central Authority of that Party that provided the information of the action taken.

Article 16(2) also obligates the Contracting Parties to assist each other to the extent permitted by their respective laws in proceedings relating to forfeiture of proceeds and instrumentalities of offenses, restitution to victims of crime, and collection of fines imposed as sentences in criminal prosecutions. Under Article 16(3), the Party having custody over proceeds or instrumentalities of offenses is required to dispose of them in accordance with its laws. Either party may share forfeited assets or the proceeds of their sale with the other Party, to the extent not prohibited by the transferring party's laws and upon such terms as it deems appropriate. To the extent permitted by law, a conviction in the Requesting State may serve as a basis for forfeiture in the Requested State.

Article 17 states that assistance and procedures provided in the Treaty shall not prevent either Contracting Party from granting assistance to the other Party through the provisions of other applicable international agreements or through the provisions of its national laws. The Parties may also provide assistance pursuant to any bilateral arrangement, agreement of practice which may be applicable.

Article 18 provides that the Central Authorities of the Contracting Parties shall consult, at times mutually agreed, to promote the most effective use of the Treaty, and may agree upon such practical measures as may be necessary to facilitate the Treaty's implementation.

Article 19 provides that the Treaty shall be subject to ratification and the instruments shall be exchanged at Washington whereupon the Treaty shall enter into force. Article 19(4) further provides that either party may terminate the Treaty by written notice to the other party, with termination to become effective six months after the date of receipt of such notice.

Technical Analyses explaining in detail the provisions of these Treaties are being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of these Treaties by the Senate as soon as possible.

Respectfully submitted,

MADELEINE ALBRIGHT.

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF ANTIGUA AND BARBUDA

ON

MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

(1)

2

## TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Scope of Assistance |
| Article 2 | Central Authorities |
| Article 3 | Limitations on Assistance |
| Article 4 | Form and Contents of Requests |
| Article 5 | Execution of Requests |
| Article 6 | Costs |
| Article 7 | Limitations on Use |
| Article 8 | Testimony or Evidence in the Requested State |
| Article 9 | Records of Government Agencies |
| Article 10 | Testimony in the Requesting State |
| Article 11 | Transfer of Persons in Custody |
| Article 12 | Location or Identification of Persons or Items |
| Article 13 | Service of Documents |
| Article 14 | Search and Seizure |
| Article 15 | Return of Items |
| Article 16 | Assistance in Forfeiture Proceedings |
| Article 17 | Compatibility with Other Arrangements |
| Article 18 | Consultation |
| Article 19 | Ratification, Entry Into Force, and Termination |

3

The Government of the United States of America and the Government of Antigua and Barbuda,

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

4

2

Article 1

Scope of Assistance

1.   The Contracting Parties shall provide mutual
assistance, in accordance with the provisions of this Treaty, in
connection with the investigation, prosecution, and prevention
of criminal offenses, and in proceedings related to criminal
matters.

2.   Assistance shall include:

(a)  taking the testimony or statements of persons;

(b)  providing documents, records, and articles of
     evidence;

(c)  locating or identifying persons;

(d)  serving documents;

(e)  transferring persons in custody for testimony or
     other purposes;

(f)  executing requests for searches and seizures;

(g)  assisting in proceedings related to
     immobilization and forfeiture of assets;
     restitution; collection of fines; and

(h)  any other form of assistance not prohibited by
     the laws of the Requested State.

5

3

3.   Except as otherwise provided in this Treaty,
assistance shall be provided without regard to whether the
conduct which is the subject of the investigation, prosecution,
or proceeding in the Requesting State would constitute an
offense under the laws of the Requested State.

4.   This Treaty is intended solely for mutual legal
assistance in criminal matters between the Parties as set forth
in paragraph (1) above.  The provisions of this Treaty shall not
give rise to a right on the part of any private person to
obtain, suppress, or exclude any evidence, or to impede the
execution of a request.

Article 2

Central Authorities

1.   Each Contracting Party shall designate a Central
Authority to make and receive requests pursuant to this Treaty.

2.   For the United States of America, the Central
Authority shall be the Attorney General or a person designated
by the Attorney General.  For the Government of Antigua and
Barbuda, the Central Authority shall be the Attorney General or
a person designated by the Attorney General.

6

4

3.   The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

### Article 3

### Limitations on Assistance

1.   The Central Authority of the Requested State may deny assistance if:

(a)  the request relates to an offense under military law which would not be an offense under ordinary criminal law;

(b)  the execution of the request would prejudice the security or other essential public interests of the Requested State;

(c)  the request is not made in conformity with the Treaty;

(d)  the request relates to a political offense;

(e)  the request is made pursuant to Article 14 or 16 of this Treaty and relates to conduct which if committed in the Requested State would not be an offense in that State; or

(f)  the execution of the request would be contrary to the Constitution of the Requested State.

7

5

2. Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall consult with the Central Authority of the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

3. If the Central Authority of the Requested State denies assistance, it shall inform the Central Authority of the Requesting State of the basis for the denial.

### Article 4
### Form and Contents of Requests

1. A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in emergency situations. If the request is not in writing, the request shall be confirmed in writing within ten days thereafter unless the Central Authority of the Requested State agrees otherwise.

2. The request shall include the following:

8

(a) the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

(b) a description of the subject matter and nature of the investigation, prosecution, or proceeding, including the specific criminal offenses which relate to the matter;

(c) a description of the evidence, information, or other assistance sought; and

(d) a statement of the purpose for which the evidence, information, or other assistance is sought.

3.   To the extent necessary and possible, a request shall also include:

(a) information on the identity and location of any person from whom evidence is sought;

(b) information on the identity and location of a person to be served, that person's relationship to the proceedings, and the manner in which service is to be made;

(c) information on the identity and whereabouts of a person to be located;

9

7

(d)   a precise description of the place or person to
be searched and of the articles to be seized;

(e)   a description of the manner in which any
testimony or statement is to be taken and
recorded;

(f)   a list of questions to be asked of a witness;

(g)   a description of any particular procedure to be
followed in executing the request;

(h)   information as to the allowance and expenses to
which a person asked to appear in the Requesting
State will be entitled; and

(i)   any other information which may be brought to the
attention of the Requested State to facilitate
its execution of the request.

Article 5

Execution of Requests

1.   The Central Authority of the Requested State shall
promptly execute the request or, when appropriate, shall
transmit it to the authority having jurisdiction to do so.  The
competent authorities of the Requested State shall do everything
in their power to execute the request.  The competent judicial

10

8

or other authorities of the Requested State shall have power to
issue subpoenas, search warrants, or other orders necessary to
execute the request.

   2.   The Central Authority of the Requested State shall
make all necessary arrangements for and meet the costs of the
representation in the Requested State of the Requesting State in
any proceedings arising out of a request for assistance.

   3.   Requests shall be executed according to the internal
laws and procedures of the Requested State except to the extent
that this Treaty provides otherwise.  Procedures specified in
the request shall be followed except to the extent that those
procedures cannot lawfully be followed in the Requested State
Where neither the Treaty nor the request specifies a particular
procedure, the request shall be executed in accordance with the
appropriate procedure under the laws applicable for
investigations or proceedings in the Requested State.

   4.   If the Central Authority of the Requested State
determines that execution of a request would interfere with an
ongoing criminal investigation, prosecution, or proceeding in
that State, it may postpone execution, or make execution subject
to conditions determined to be necessary after consultations
with the Central Authority of the Requesting State.  If the

11

Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5.   The Requested State shall use its best efforts to keep confidential a request and its contents, if such confidentiality is requested by the Central Authority of the Requesting State. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6.   The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request.

7.   The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request.  If the request is denied, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the basis for the denial.

12

10

### Article 6

#### Costs

The Requested State shall pay all costs relating to the execution of the request, except for the fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 10 and 11, which costs, fees, allowances, and expenses shall be paid by the Requesting State.

### Article 7

#### Limitations on Use

1. The Requesting State shall not use any information or evidence obtained under this Treaty for any purposes other than for the investigation, prosecution or suppression in the territory of the Requesting State of those criminal offenses stated in the request without the prior consent of the Requested State.

2. The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential or be used only subject to terms and conditions it may specify. If the Requesting State accepts the information or evidence subject to such conditions, the

13

11

Requesting State shall use its best efforts to comply with the
conditions.

3.   Nothing in this Article shall preclude the use or
disclosure of information to the extent that there is an
obligation to do so under the Constitution of the Requesting
State in a criminal prosecution.  The Requesting State shall
notify the Requested State in advance of any such proposed
disclosure and the provision of the Constitution under which
such disclosure is required.

4.   Information or evidence which has been made public in
the Requesting State in accordance with paragraphs 1 or 2 may
thereafter be used for any purpose.

Article 8

Testimony or Evidence in the Requested State

1.   A person in the Requested State from whom testimony or
evidence is requested shall be compelled, if necessary, to
appear and testify or produce items, including documents,
records, and articles of evidence.

2.   Upon request, the Central Authority of the Requested
State shall furnish information in advance about the date and

14

12

place of the taking of the testimony or evidence pursuant to this Article.

3.   The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to question the person giving the testimony or evidence.

4.   If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State for resolution by the authorities of that State.

5.   Evidence produced in the Requested State pursuant to this Article or which is the subject of testimony taken under this Article may be authenticated by an attestation, including, in the case of business records, authentication in the manner indicated in Form A appended to this Treaty.   Documents authenticated by Form A shall be admissible in evidence in the Requesting State.

15

13

### Article 9

### Records of Government Agencies

1.   The Requested State shall provide the Requesting State with copies of publicly available records, including documents or information in any form, in the possession of government departments and agencies in the Requested State.

2.   The Requested State may provide copies of any records, including documents or information in any form, which are in the possession of a government department or agency in that State, but which are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities. The Requested State may in its discretion deny a request pursuant to this paragraph entirely or in part.

3.   Official records produced pursuant to this Article may be authenticated by the official in charge of maintaining them through the use of Form B appended to this Treaty. No further authentication shall be necessary. Documents authenticated under this paragraph shall be admissible in evidence in the Requesting State.

16

14

## Article 10

### Testimony in the Requesting State

1.   When the Requesting State requests the appearance of a person in that State, the Requested State shall invite the person to appear before the appropriate authority in the Requesting State.  The Requesting State shall indicate the extent to which the expenses will be paid.  The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the response of the person.

2.   The Central Authority of the Requesting State shall inform the Central Authority of the Requested State whether a decision has been made by the competent authorities of the Requesting State that a person appearing in the Requesting State pursuant to this article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the Requested State.

3.   The safe conduct provided for by this Article shall cease seven days after the Central Authority of the Requesting State has notified the Central Authority of the Requested State that the person's presence is no longer required, or when the

17

15

person, having left the Requesting State, voluntarily returns. The competent authorities of the Requesting State may, in their discretion, extend this period for up to fifteen days if they determine that there is good cause to do so.

### Article 11

### Transfer of Persons in Custody

1.   A person in the custody of the Requested State whose presence in the Requesting State is sought for purposes of assistance under this Treaty shall be transferred from the Requested State to the Requesting State for that purpose if the person consents and if the Central Authorities of both States agree.

2.   A person in the custody of the Requesting State whose presence in the Requested State is sought for purposes of assistance under this Treaty may be transferred from the Requesting State to the Requested State for that purpose if the person consents and if the Central Authorities of both States agree.

3.   For purposes of this Article:

(a)  the receiving State shall have the authority and the obligation to keep the person transferred in

18

16

custody unless otherwise authorized by the

sending State;

(b)   the receiving State shall return the person

transferred to the custody of the sending State

as soon as circumstances permit or as otherwise

agreed by both Central Authorities;

(c)   the receiving State shall not require the sending

State to initiate extradition proceedings for the

return of the person transferred; and

(d)   the person transferred shall receive credit for

service of the sentence imposed in the sending

State for time served in the custody of the

receiving State.


Article 12

Location or Identification of Persons or Items

The Requested State shall use its best efforts to ascertain

the location or identity of persons or items specified in the

request.

19

17

### Article 13

#### Service of Documents

1.   The Requested State shall use its best efforts to effect service of any document relating, in whole or in part, to any request for assistance made by the Requesting State under the provisions of this Treaty.

2.   The Requesting State shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting State a reasonable time before the scheduled appearance.

3.   The Requested State shall return a proof of service in the manner specified in the Request.

### Article 14

#### Search and Seizure

1.   The Requested State shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State.

2.   Upon request, every official who has custody of a seized item shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the identity of the

20

18

item, and the integrity of its condition. No further

certification shall be required. The certificate shall be

admissible in evidence in the Requesting State.

3.   The Central Authority of the Requested State may

require that the Requesting State agree to the terms and

conditions deemed to be necessary to protect third party

interests in the item to be transferred.


Article 15

Return of Items

The Central Authority of the Requested State may require

that the Central Authority of the Requesting State return any

items, including documents, records, or articles of evidence

furnished to it in execution of a request under this Treaty as

soon as possible.

Article 16

Assistance in Forfeiture Proceedings

1.   If the Central Authority of one Contracting Party

becomes aware of proceeds or instrumentalities of offenses which

are located in the territory of the other Party and may be

forfeitable or otherwise subject to seizure under the laws of

that Party, it may so inform the Central Authority of the other

21

19

Party.  If the Party receiving such information has jurisdiction in this regard, it may present this information to its authorities for a determination whether any action is appropriate.  These authorities shall issue their decision in accordance with the laws of their country.  The Central Authority of the Party that received the information shall inform the Central Authority of the Party that provided the information of the action taken.

2.   The Contracting Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions. This may include action to temporarily immobilize the proceeds or instrumentalities pending further proceedings.

3.   The Party that has custody over proceeds or instrumentalities of offenses shall dispose of them in accordance with its laws. Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the extent permitted by the transferring Party's laws and upon such terms as it deems appropriate.

22

20

4.  To the extent permitted under the law of the Requested State, a conviction in the Requesting State may serve as a basis for forfeiture in the Requested State.

Article 17

Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either Contracting Party from granting assistance to the other Party through the provisions of other applicable international agreements, or through the provisions of its national laws.  The Parties may also provide assistance pursuant to any bilateral arrangement, agreement, or practice which may be applicable.

Article 18

Consultation

The Central Authorities of the Contracting Parties shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty.  The Central Authorities may also agree on such practical measures, including training and technical assistance, as may be necessary to facilitate the implementation of this Treaty.

23

21

Article 19

Ratification, Entry Into Force, and Termination

1.    This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged at Washington as soon as possible.

2.    This Treaty shall enter into force upon the exchange of instruments of ratification.

3.    This Treaty shall apply to any request presented after the date of its entry into force whether the relevant acts or omissions occurred prior to or after that date.

4.    Either Party may terminate this Treaty by means of written notice to the other Party.  Termination shall take effect six months following the date of receipt of the notification.


IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments have signed this Treaty.

DONE at St. John's , in duplicate, this    31st day of October , 1996.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF ANTIGUA AND BARBUDA:

24

**Form A**

**CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS**

I, _____[name]_____, attest on penalty
of criminal punishment for false statement or attestation that I
am employed by _____[name of business from which
documents are sought]_____ and that my official title
is _____[official title]_____. I
further state that each of the records attached hereto is the
original or a duplicate of the original record in the custody of
_____[name of business from which documents are
sought]_____.

I further state that:

    A)    such records were made, at or near the time of the
occurrence of the matters set forth, by (or from
information transmitted by) a person with knowledge of
those matters;

    B)    such records were kept in the course of a regularly
conducted business activity;

    C)    the business activity made such records as a regular
practice; and

    D)    if any such record is not the original, it is a
duplicate of the original.

_____[signature]_____        _____[date]_____

Sworn to or affirmed before me, _____[name]_____, a
judicial officer, this _____ day of _____, 19____.

25

**Form B**

**ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS**

I, _____[name]_____, attest on penalty
of criminal punishment for false statement or attestation that
my position with the Government of _____[country]_____
is _____[official title]_____ and that in that
position I am authorized by the law of _____[country]_____
to attest that the documents attached and described below are
true and accurate copies of original official records which are
recorded or filed in _____[name of office or
agency]_____, which is a government office or agency of
_____[country]_____.

Description of Documents:

_____[signature]_____

_____[title]_____

_____[date]_____

26

**Form C**

**ATTESTATION WITH RESPECT TO SEIZED ARTICLES**

I, _____ [name] _____, attest on penalty
of criminal punishment for false statement or attestation that
my position with the Government of _____ [country] _____
is _____ [official title] _____. I
received custody of the articles listed below from _____
[name of person] _____ on _____ [date] _____,
at ___ [place] ___ in the same condition as when I received
them (or, if different, as noted below).

Description of Articles:


Changes in condition while in my custody:


_____ [signature] _____


_____ [title] _____

Official Seal

_____ [place] _____

_____ [date] _____